## THE MURPHY TUGS.

*(District Court, E. D. Michigan. June 17, 1886.)*

1. MARITIME LIEN—DIVER AND ENGINEER ON WRECKING TUG.
    A person employed as a diver and engineer of a steam-pump upon a wrecking-tug has a lien upon such tug for his services. So, if he contract for services upon any of several tugs belonging to the same company to which he may be ordered, and his engagement be for a *per diem* compensation, he is entitled to a lien upon each of such tugs for the time he is actually employed about her.

2. SAME—LIEN OF OWNERS OF STEAMER ASSISTING TUG.
    So, if the services of a steamer are necessary to assist such tugs in rescuing wrecked vessels by dredging, pulling, running upon errands, or otherwise, the owner of such steamer has a lien upon the tug.

3. SAME—ENGINEER ON ANNUAL SALARY.
    A person employed as chief engineer of a line of vessels at an annual salary has no lien upon any vessel of the line for his compensation.

4. SAME—REPAIRS BY STOCKHOLDER—PRIORITY OF LIEN.
    Where a stockholder and director of a steam-boat line, who also held the office of treasurer, put repairs upon the several vessels of the line, it was held that his lien, if he had any at all, should be postponed to that of the other creditors.

5. SAME—WHARFAGE—LAKES IN WINTER.
    There is no lien for wharfage during the winter season upon the lakes.

In Admiralty.

The tugs Gladiator, Andrew J. Smith, Balize, Kate Williams, and William A. Moore, belonging to the Detroit Tug & Transit Company, of which Samuel J. Murphy was president, having been sold by the

marshal, and the proceeds paid into the registry, it was stipulated that the various questions of liability for doubtful claims should be informally considered by the court upon exceptions to the report of the commissioner assessing damages.

BROWN, J. The first claim is that of Harry Clark for services as a diver and steam-pump engineer, rendered upon the following state of facts:

In April, 1885, the libelant made a contract at Detroit with Mr. Murphy, president of the Detroit Tug & Transit Co., to serve as diver and steam-pump engineer, and was to be paid for his services $10 a day and his expenses from the time he left Detroit until his return. In pursuance of this contract, libelant proceeded by rail to the south shore of Lake Superior and reported for duty to the master of the tug Smith. It was then employed in the work of releasing the steam-barge Morley, which was aground at that point. He worked under the orders of the master of the Smith from April 15th to May 17th, hauling lines, locating the tug and her lighter for the promotion of the work, diving and running a steam-pump when necessary. When the job was completed, he was ordered to go to the schooner Harvey Bissell, which was ashore near Marquette. He walked from Marquette to the Bissell and was engaged five days in assisting in getting her afloat. During this time his work was done either upon the Bissell or upon the wrecking schooner Johnson in attendance upon her. The tug Gladiator, owned by the Tug and Transit company, was at work at this wreck. From there he was ordered to the wreck of the Erin, where the tug Williams, also owned by the claimant, was at work, and was engaged there until she was raised, and stayed upon her until she was towed to Collingwood, from which point he went by rail to Detroit, where he arrived June 17th. The testimony shows that at each point where he worked he acted under the immediate orders of the captain of the tug which was engaged upon the wreck, but that it was a single contract when made, and that if he was ordered to go anywhere else he certainly should have gone, and that he would have expected pay at the rate of $10 and expenses until the return to Detroit.

There can be no question in this case that the services rendered by libelant were maritime in their nature, and that if he had made the contract in each instance with the salved vessel, he would have a lien upon such vessel enforceable in this court. I deem it equally clear that if a tug be fitted out at the opening of the season for wrecking purposes, and as a part of her equipment engages the services of a diver or steam-pump engineer, such diver or engineer would also have a lien upon the tug to which he was attached for the season. *The Highlander*, 1 Spr. 510. In such case he would not probably be entitled to a lien upon the different salved vessels, since his own contract is with the tug. This was the conclusion of my predecessor in the case of *The Marquette*, 1 Brown, Adm. 364, and I have seen no reason to doubt its correctness. The difficulty in this case arises from the fact that the contract between the libelant and the Tug and Transit company was not for services upon any particular tug, but for services upon any tug owned by the company to which he might be ordered. I doubt if this circumstance varies in any way the principle applicable to this class of cases if his services are paid by the day,

and are therefore capable of apportionment. While the services may not be actually rendered upon the tug, he is for the time being a part of the equipment of such tug, and entitled to a lien upon her, upon the principle announced by this court in the case of *The Minna*, 11 Fed. Rep. 759, in which I had occasion to hold that all hands employed upon a vessel, except the master, were entitled to a lien, if their services were in furtherance of the main object of the enterprise in which she was engaged. In this case a lien was sustained in favor of persons employed upon a fishing tug, solely for the purpose of catching and preserving fish, notwithstanding the fact that they took no part in the navigation of the vessel, and that an incidental portion of their duties was performed on shore.

To deny the libelant a remedy by lien is virtually turning him over to a personal claim against an insolvent corporation. While the case is a somewhat doubtful one, I am inclined to allow the claim.

The claim of Joseph Croze against the Gladiator is not distinguishable in principle from that of Clark. He alleges that, while the Gladiator was engaged in wrecking vessels upon Lake Superior, it became necessary for her master to employ his tug to assist the Gladiator, by dredging, pulling, running of errands, and otherwise, and it is conceded that such services were necessary to enable the Gladiator to get the stranded vessels off the shore. It is contended, however, that libelant has no lien upon the Gladiator, but his remedy, if he has any, is against the salved vessel. But there is no evidence that he was employed by the master of the salved vessel, or that the master of the Gladiator had any authority to bind her by his employment. His contract was to release the stranded vessel for a certain sum, and to furnish all the necessary appliances for the task. Libelant knew that this was in substance the contract between them, and it is clear that he could have no lien upon the stranded vessel. Of course, libelant has no lien upon the Gladiator as a salvor, but I see no reason why, if the services of his tug were valuable to the Gladiator, he should not be entitled to the lien of a material-man. In *Amis* v. *The Louisa*, 9 Mo. 629, it was held by the supreme court of Missouri that work done upon barges charged to have been appurtenances of a steam-boat gave rise to a lien against the latter, upon the theory that the barges were considered as necessary appendages to the steam-boat in order to enable her to transport freight. So, in *Gleim* v. *The Belmont*, 11 Mo. 112, it was held that the hire of a barge to a steam-boat would be regarded as material furnished for her equipment. This was also the ruling in Iowa, in *The Kentucky* v. *Brooks*, 1 G. Greene, 398. See, also, *The Dick Keys*, 1 Biss. 408.

Upon the whole, I think this claim is a meritorious one, and should be allowed.

The claim of Thomas Murphy for his salary as chief engineer of the line, which was composed of five tugs and a schooner, must be disallowed. His services consisted in planning, superintending, and

directing the operation, repairs, and improvements upon the several vessels of the line, and keeping them in a sea-worthy condition, at a salary of $1,500 per year. But, however meritorious these services may have been, it is impossible to apportion his compensation among the different vessels of the line. Maritime liens are said to be *stricti juris*, and, while courts in recent years have been very liberal in sustaining them for maritime services, the work done for such vessels must be capable of definite ascertainment and apportionment. We have no right to adjust a demand for work done for the benefit of several vessels, and to charge each with its proportion upon an equitable basis.

Murphy's bills for repairs put upon these vessels are not open to this criticism, but they are objectionable for another reason. He was not only a stockholder in the Tug and Transit company to the amount of $30,000, as well as a director, but was treasurer of the company, and entitled by law to the custody of its funds. It is true that his acts as treasurer consisted merely in indorsing checks for deposit, and that he did not in fact handle the funds of the corporation; but, if he chose to waive his legal rights in this particular, the other creditors of the company ought not to be prejudiced by reason of his neglect. I do not think the mere fact that he was a director and stockholder would necessarily prevent his contracting with the company, or from acquiring a lien upon the property. But his position as the legal custodian of its funds is strong evidence to show that he relied upon the personal credit of the company, or, rather, upon his ability to pay himself out of its funds, and his lien should therefore be postponed to that of the other creditors. *The St. Joseph*, 1 Brown, Adm. 202.

The claim of William Miller for wharfage during the winter of 1884 and 1885 must also be rejected. It has been our practice to limit the application of the state statute giving a lien for wharfage to the season of navigation, when the use of a wharf is necessary to the employment of the vessel, but not to allow a lien for services rendered the vessel while she is laid up during the winter; such as the use of a slip, the storage of sails and rigging, or the hiring of a watchman. These are in no sense maritime in their nature. *The E. A. Barnard*, 2 Fed. Rep. 712; *The Island City*, 1 Low. 375; *The Thomas Scattergood*, 1 Gilp. 1. In cases of this kind the wharfinger would probably have a common-law lien dependent upon possession, and he should not relinquish such lien until his claim is satisfied.