franchise." 1956 U.S.Code Cong. & Adm.News, pp. 4596, 4603.

The franchise agreement does not require that a dealer who falls below his assigned MSR must be terminated. It merely makes termination possible. The determination of whether or not to terminate a franchise is a management decision. It is noted that the MSR is the only performance standard in the franchise contract. The "good faith" required by 15 U.S.C. § 1222 is defined in 15 U.S.C. § 1221(e) to mean acting in "a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion [or] intimidation * * *." As applicable to termination of the franchise due to sales below MSR, "good faith" would require that termination be actually based on poor performance and not based, in fact, on some ulterior motive.

The Court in Madsen v. Chrysler Corp., supra, determined that a standard in which forty percent of the dealers sold under MSR and were subject to termination at all times was ridiculous and arbitrary. The plaintiffs here rely heavily upon this case for their position that the MSR requirement is "not a fair and equitable formula designed to protect dealers from coercion or intimidation." That case is not controlling here. The Court in that case found that the termination of the dealer's franchise by Chrysler was not, in fact, due to failure to meet MSR. The Court found that Chrysler was pleased with the dealer's performance and had expressed such pleasure to him. The equities in that case were clearly on the dealer's side. The present case presents a different picture entirely. The mere fact that sixty-two out of one hundred sixty-two dealers in the St. Louis region failed to meet their Minimum Sales Responsibility during the period of October 1967 to April 1968 does not lead this Court to the decision at this stage of the hearing that it is probable that such a standard shows a lack of good faith, per se.

The plaintiffs have not shown that there is a reasonable possibility that they will succeed on the merits of Count III at a final hearing. A temporary injunction based upon Count III would be inappropriate. See Bateman v. Ford Motor Co., 204 F.Supp. 357 (E.D.Pa. 1962); and A.F.L. Motors, Inc. v. Chrysler Motors Corp., 183 F.Supp. 56 (E.D.Wis.1960). The same evidence and considerations discussed with relation to Count III also make inappropriate a temporary injunction based upon Counts IV and V.

Jaime F. G. **MIRANDA**

v.

**TEXACO, INC.**

**Civ. A. No. 35897.**

United States District Court
E. D. Pennsylvania.

May 19, 1969.

Fine, Staud, Silverman & Grossman, by Louis Samuel Fine, Philadelphia, Pa., for plaintiff.

Krusen, Evans & Byrne, by Joseph P. Green, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

JOSEPH S. LORD, III, District Judge.

### Findings of Fact

1. On or about July 27, 1963, the plaintiff was employed by the defendant as an ordinary seaman on the 4 to 8 watch aboard the SS Texaco Wisconsin, a merchant vessel which was owned, operated, controlled and maintained by the defendant.

2. On or about July 27, 1963, on the 4 to 8 watch in the afternoon the port anchor of the SS Texaco Wisconsin was dropped in Balboa, Panama Canal Zone.

3. At the time the anchor was dropped in Balboa AB seaman Norman was on the wheel, first mate Anderson was at the bow of the vessel, and the plaintiff was stationed at the anchor brake.

4. In order to drop the anchor the plaintiff, upon the instructions of Anderson, opened the brake to allow the anchor chain to pass through the chain pipe from the chain locker over the wildcat and through the hawse pipe.

5. When the plaintiff, acting upon instructions from Anderson, opened the brake the anchor chain ran freely and from it there arose an unusual cloud of dust which enveloped the plaintiff.

6. The port anchor had last been raised when the ship had left a California port some six days before its arrival in Balboa.

7. The dust which enveloped the plaintiff came from the anchor chain and resulted because the mud from the bottom had not been properly cleaned from the chain when the anchor chain was raised.

8. If the anchor chain had been properly cleaned the amount of dust would

have been minimal and of no consequence.

9. The cloud of dust was unusually and excessively large and was large enough to have been seen by Norman in the wheelhouse and by the second pump man, Canada, who were both a substantial distance from the anchor chain.

10. The customary method of washing mud from the anchor chain is by the use of a fire hose played on the chain as it is brought in. Because of the fexibility and mobility of the fire hose, the crewman handling it is able to reach all sides and all portions of the chain with the stream of water flowing from the hose, in addition to which if any portion of the chain is not thoroughly cleaned, the chain can be stopped and the hose played on the uncleaned portion to remove the mud.

11. The wash down system on the SS Texaco Wisconsin consisted of a spigot having a small diameter which could play upon only one portion of the chain as it was brought in and stopping the chain would not enable the stream from the spigot to reach any part that was not cleaned because of the limitations of the stream.

12. The wash down system on the SS Texaco Wisconsin was not reasonably fit for its intended purpose in that:

(a) the pressure was inadequate;

(b) the location and positioning of the spigot made it impossible adequately and properly to clean the mud from the anchor chain;

(c) stopping the chain would not make it possible to remove the mud by reason of the positioning of the spigot.

13. If bottom mud is not adequately cleaned from the anchor chain it will become dried and caked so that when the anchor chain is released the dried mud will fly from the chain either in a cloud of dust or in larger rock-like pieces.

14. The cloud of dust occurred when the plaintiff acting under instructions, released the anchor and was the direct result of the inadequate wash down system on the SS Texaco Wisconsin.

15. When the large cloud of dust enveloped the plaintiff, the dust entered his eyes, ears, nose and mouth which irritated his nose, eyes and mouth.

16. As a result of the irritation of plaintiff's nose, nostrils, mucosa and turbinates, plaintiff has suffered allergic rhinitis.

17. As a further result, plaintiff suffered diarrhea and discomfort, which after treatment and medication disappeared in approximately two weeks.

18. As a further result of the said inhalation, plaintiff's eyes were irritated for several days following the occurrence.

19. At the time of the accident plaintiff was 29 years of age and was in good health. He is presently 35 years of age and has a life expectancy of 36 years. His work expectancy is 30 years.

20. Since the accident plaintiff has been under constant medical care for allergic rhinitis and allergic asthma. His complaints have been from the time of the accident to the present time, inability to breath, filling of the nasal passages with mucous, post-nasal drip, pain about the nose, face, eyes, head and ears, chronic infection of the upper respiratory tract, difficulty in breathing, inability to engage in any prolonged exertion because of his difficulty in breathing, and inability to sleep.

21. As a further result of the said inhalation and the complications suffered therefrom, plaintiff is required to sleep in a sitting position. He is required to take three different types of medicines, some of them at least every four hours as a result of which his sleep is interrupted.

22. If plaintiff were to fail to take these medications he would be unable to breath.

23. Plaintiff has had a Sixth grade education and has had no training except as an ordinary seaman.

24. Plaintiff has been and will be permanently disabled from performing the work of an ordinary seaman in the future.

25. Plaintiff has had no earnings since August 3, 1963.

26. As a further result of the accident plaintiff has been compelled to move from Philadelphia to San Diego, where he is presently under the care of the U. S. Public Health Service.

27. Plaintiff had previously been hospitalized for allergic rhinitis in the U. S. Public Health Hospital in Baltimore, Maryland, and on one occasion in the U. S. Public Health Service Hospital in Staten Island, N. Y.

28. In the year 1962 plaintiff earned $5,347.72.

29. In the five years preceding 1963 the plaintiff sailed approximately three months per year on the average.

30. In view of the sporadic work record of plaintiff during these five years, we find that plaintiff's average earnings for that period would have been $3,000 per year.

31. Plaintiff has suffered lost earnings for five years and nine months in the total amount of $11,250.00.

32. The rate of pay for able bodied seamen has increased and will continue to increase, and plaintiff will suffer a future loss of earning power of $4,500 per year for a working expectancy of 30 years having a present value at 3½% of $82,664.00.

33. Plaintiff has sustained no medical expenses to date and has not sustained his burden of proving that he will suffer any such expenses in the future.

34. Plaintiff is entitled to compensation for past and future pain, suffering and inconvenience in the amount of $20,000.

### Conclusions of Law

1. This court has jurisdiction over the parties and the subject matter of the action.

2. Defendant was under a duty to supply plaintiff with a seaworthy vessel.

3. Defendant was under a duty to use reasonable care to supply plaintiff with a reasonably safe place to work.

4. The defendant's vessel was unseaworthy in that the vessel and its appurtenances were not reasonably adequate for the purposes intended.

5. Defendant was negligent in failing to exercise reasonable care to supply plaintiff with reasonably safe equipment and a reasonably safe place to work.

6. Defendant's negligence and the unseaworthiness of the defendant's vessel were the proximate cause of plaintiff's injury and present condition.

7. The plaintiff was not guilty of contributory negligence.

8. Defendant is liable to plaintiff.

9. Plaintiff is entitled to judgment in the amount of $113,914.00.