**Darrell TAYLOR**

v.

**PACKER DIVING AND SALVAGE COMPANY, Inc.**

**Civ. A. No. 69–956.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

May 21, 1971.

John R. Martzell, Martzell & Montero, New Orleans, La., for plaintiff.

Donald M. Pierce, Organ & Pierce, New Orleans, La., for defendant.

COMISKEY, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.

On February 6, 1969 Darrell Taylor was employed by Packer Diving and Salvage Co. as a diver.

2.

At that time he had been so employed for approximately a year in the capacity of a diver.

3.

Taylor was injured on February 6, 1969 when an elevator-cable on a partially constructed diving tank in the yard of Packer Diving and Salvage Co. broke dropping the elevator with Taylor aboard to the ground.

4.

Darrell Taylor was a well-known underwater welder prior to his employment.

5.

Packer Diving and Salvage Co. is a diving company which specializes in burying underwater pipelines in the Gulf of Mexico between production platforms. The company has consistently sought to be considered experts and specialists in this field in the oil industry.

6.

The work of burying underwater pipelines inevitably requires the use of special-purpose vessels, either barges or boats, which are specially designed and outfitted for burying underwater pipelines. The work cannot be done without

vessels whose specific purpose is burying underwater pipelines.

7.

In underwater pipe burying, a diver doing the type of work the plaintiff did is an integral and indispensible member of the crew of the vessel. The diver must position the jet line for digging the trench and in certain circumstances the diver stays below during the entire burying operation.

8.

When not below the surface, the plaintiff as a diver operates cranes on the vessels, handles the jetting and diving equipment, and generally acts in a capacity which contributes to the general mission of the vessel.

9.

During a substantial portion of Darrell Taylor's employ, Packer Diving and Salvage Company leased for its own work a barge, the Packer No. 1, which it specially outfitted as a pipe burying barge. The lease terminated prior to Taylor's accident, but subsequent thereto another similar barge was acquired for pipe-burying use.

10.

In addition to pipe burying work, Packer Diving and Salvage Company did underwater welding work in the Gulf of Mexico, practically all of which work, insofar as Darrell Taylor was concerned, was from vessels.

11.

Darrell Taylor was hired in August of 1969 by Packer Diving and Salvage Company.

12.

Approximately the first three months of Taylor's work was on a pipe burying barge for Aquatic Marine Co. Some portion of this three months may have been spent on two other Aquatic pipe burying barges.

13.

Packer Diving and Salvage Company provided a crew of divers, tenders, and a diving foreman for the Aquatic pipe burying barges. This crew did the indispensible diving work, handled the jetting and diving equipment and supplemented the work of the other barge crew members.

14.

These barges had living quarters and food facilities aboard and Darrell Taylor lived on and was assigned to these barges during his work tour. Mr. Taylor was a member of the crew of these barges and did all of his work either on or from these barges.

15.

Darrell Taylor's next tour of duty was aboard the pipe-burying barge Packer No. 1. This barge was leased by Packer Diving and Salvage Co. for its exclusive use in its pipe burying work. Taylor spent approximately two months on the Packer No. 1.

16.

The entire crew of the Packer No. 1 was employed by Packer Diving and Salvage Co. Taylor was a member of the crew of the Packer No. 1 and spent all of his work time on those particular jobs on the Packer No. 1.

17.

Packer Diving and Salvage Company leased a jack-up barge which was a vessel from Arthur J. Levy and Co. for underwater welding work. Arthur J. Levy provided only a barge operator and the balance of the entire crew were employees of Packer.

18.

Darrell Taylor took part in all the crew functions including diving, welding and on-deck machinery operator which was the purpose of the vessel. Darrell Taylor was a member of the crew of that barge and spent all of his working time on this job working on or from the Arthur J. Levy barge. Taylor spent approximately one month on this barge.

19.

Darrell Taylor was employed by Packer Diving and Salvage Company as a

seaman and he performed substantially all of his work aboard vessels for Packer which was a company specially working in vessel-oriented diving activity.

20.

Just prior to his employment, Darrell Taylor sold to Packer Diving and Salvage Co. a large tank some 30 feet in length.

21.

In the latter part of 1968 or the early part of 1969, officers of Packer Diving and Salvage Company decided to convert the tank into a diving training tank for training in underwater welding.

22.

The design for the tank and a personnel elevator on the side of the tank was prepared by the President, Operations Manager and engineer for Packer.

23.

Since Darrell Taylor was an expert underwater welder, he was instructed to assist in the building of the tank by specifying where certain pipes and valves were to be placed.

24.

Darrell Taylor was never permanently reassigned to the yard to build the tank. His profession was diving.

25.

It was understood that the work on the tank was temporary fill-in work for divers and tenders. It was understood that Taylor would return to his usual duties as a diver after the tank was finished and when diving work was available. Taylor was not removed from diving work during work on the tank. The work on the tank only lasted from January 29, 1969 to February 6, 1969.

26.

During the work on the tank, Taylor made as many as three diving jobs, all off of vessels.

27.

Two days before the accident in suit, Taylor was the diver on a vessel and his mission for the vessel was to find a ship's wheel which had been dropped to the bottom of a river.

28.

Darrell Taylor did not cease to be a seaman during his work on the tank as the work was merely fill-in work and at most a temporary land-based assignment. At the time of the accident in suit, Taylor was a seaman acting in the course and scope of his employment for Packer Diving and Salvage Company.

29.

The plaintiff's supervisor in charge of building the elevator was Bob Norman, the diving supervisor and Operations Manager for Packer Diving and Salvage Company.

30.

The tank was to stand upright with interior facilities for training divers. Urban Henry, President of Packer, decided that a personnel elevator should be installed on the exterior of the tank.

31.

Urban Henry ordered that a used air hoist was to be used as motive power for the elevator. On the hoist was an old cable which was unfit for use on the hoist.

32.

Darrell Taylor instructed Mike Richardson, a Packer diving tender who was temporarily assigned to the tank job to buy a new cable for the hoist. Richardson represented himself to Taylor as an experienced cable splicer, when in fact he was not.

33.

When Richardson returned with the new cable, Bob Norman became aware of the purchase and ordered that the new cable be returned and that scrap cable in the yard be used instead. The reason given by Norman was to avoid putting more money into the tank.

**34.**

A search was instituted for cable in the yard, but no suitable cable could be found.

**35.**

The Court finds that at no time did Bob Norman ever order the use of the new cable, Norman's testimony to the contrary is inherently incredible and Norman's demeanor on the witness stand was such to make the Court doubt his credibility.

**36.**

Darrell Taylor had no background or experience in elevator design or cable splicing.

**37.**

Since there was no suitable cable in the yard and since Bob Norman had refused to permit use of the new cable, Darrell Taylor instructed Mike Richardson to splice a piece of the new cable onto the old cable, saying that he, Taylor, would pay for the piece out of his own pocket.

**38.**

Richardson had represented to Taylor that he was an experienced cable-splicer from his days in the Navy.

**39.**

Bob Norman knew of the splice and never gave any directions not to use the spliced cable. Norman was in complete control of the work being performed. Norman's testimony to the contrary is found to be incredible by this Court.

**40.**

The splice was poorly made and unsafe for use on an elevator.

**41.**

Darrell Taylor was under the guidance and control of Bob Norman at all times concerning the installation of the spliced cable.

**42.**

Bob Norman gave instructions to test the spliced cable with weight. Darrell Taylor performed this test and the splice held.

**43.**

On the morning of the accident Bill Blade, a welder on the job, rode the elevator to the top of the tank. Darrell Taylor was on the top of the tank and he got onto the elevator to ride down with Bill Blade.

**44.**

The Court finds that Taylor's riding the elevator was reasonable under the circumstances then obtaining, that Packer Diving and Salvage Co. expected and intended that its employees, including Taylor would ride the elevator, and that Taylor had exercised reasonable care for his own safety.

**45.**

As the elevator descended, the splice parted causing the elevator to fall to the ground causing severe head and leg injuries to Taylor.

**46.**

Taylor was immediately hospitalized under the care of Dr. Touzet. On February 22, 1969 Dr. Richard Levy, an eminent neurosurgeon in New Orleans, was called in consultation.

**47.**

After release from the hospital, Taylor noticed a clear discharge from his nostrils. This was diagnosed as spinal fluid.

**48.**

On April 2, 1969 Dr. Richard Levy admitted Taylor to Touro Infirmary and on April 7, 1969 a left frontal craniotomy was performed. Taylor's brain was manipulated and a tear in the brain covering on the frontal lobe was discovered and repaired. Necessarily, the nerves of smell were removed as part of the operation.

**49.**

On Dr. Levy's first examination Mr. Taylor complained of blurred vision in his left eye. There was a laceration

over the left eye. At the time of trial Taylor had lost the sight of his left eye.

### 50.

As a direct result of the injuries sustained in the accident in suit, Darrell Taylor had been rendered totally and permanently disabled for all diving and welding work and all heavy manual labor from a neurological standpoint.

### 51.

As a direct result of the injuries sustained in the accident in suit, Darrell Taylor has sustained a 50% disability of the right leg for diving work and a 15–20% disability of the right leg for any activity.

### 52.

As a direct result of the injuries sustained in the accident in suit, Darrell Taylor has lost the sight of his left eye.

### 53.

As a direct result of the accident in suit, Darrell Taylor sustained organic brain damage which has destroyed recent memory and destroyed his mental capacity to abstract and make judgments. His business judgment has been permanently impaired.

### 54.

The Court finds that Darrell Taylor has been rendered totally and permanently disabled from any gainful employment.

### 55.

As a direct result of the accident in suit, Darrell Taylor has lost his sense of taste and smell.

### 56.

As a direct result of this accident, Darrell Taylor has lost his sexual capacities.

### 57.

There was no contrary medical testimony and the physical findings, disabilities, and complaints are not in dispute.

### 58.

In the last full year of his employment, Darrell Taylor made $11,090.94. He made $6.00 per hour plus depth pay as a diver. Divers in his classification are presently making between $15,000 and $20,000 annually. Darrell Taylor has a work-life expectancy of 27.7 years and a life expectancy of 34.8 years.

### 59.

Based on annualized losses for his life expectancy and up until the date of trial, the Court finds that Darrell Taylor sustained pecuniary loss of:

| | |
|---|---|
| Loss of income to date of trial | $23,000.00 |
| Future loss of income | 130,000.00 |

### 60.

The Court finds that there is a reasonable certainty of increasing wages and cost of living increases and finds losses for cost of living increase at $33,000.00.

### 61.

The Court finds the plaintiff to have suffered the following items of physical and mental pain and suffering, disability, and mental anguish—loss of sense of taste and smell, loss of sight in left eye, permanent disability to the left leg, diminished sexual capacity, organic brain damage, loss of memory, and headaches and dizziness. An award for these elements of damage is $150,000.00.

### 62.

The Court finds that the foregoing damages were caused by the negligence of Packer Diving and Salvage Company, its officers and employees in the following particulars:

a) Failing to provide adequate supervision for the building of the elevator.

b) Failing to provide an adequate cable for the elevator.

c) Improperly splicing the elevator cable.

d) Failing to provide adequate engineering assistance in the building of the elevator.

e) Refusing to use proper cable when provided by Darrell Taylor.

f) Installing a spliced cable on an elevator.

### 63.

The Court finds that Darrell Taylor was in no way negligent in causing his injuries in that he sought to protect himself and others in the construction of the elevator, in that he had no background or experience in elevator design and construction or cable-splicing and he was under the direct control and supervision of Bob Norman.

### CONCLUSIONS OF LAW

#### 1.

■ Divers can be seamen and may be covered by the Jones Act, 46 U.S.C. § 688. The Murphy Tugs, 28 F. 429; De Gaetano v. Merritt & Co. Derrick & Wrecking Co., 203 A.D. 259, 196 N.Y.S. 573; Smith v. Brown & Root Marine Operators; Thomas E. Baker v. Ocean Systems, Inc. (W.D.La.), C.A. 14,485 (Feb. 16, 1971); Norris, The Law of Seamen (3d Ed.) § 11 Vol. 1, p. 28.

#### 2.

■ There is a factual basis for Jones Act coverage if the employee performed a substantial part of his work on a vessel and the duties which he performed contributed to the mission of the vessel. Offshore v. Robison (5 Cir.) 266 F.2d 769 at 799.

#### 3.

■ The employer need not own the vessels on which its employee serves as a seaman for the Jones Act to apply. Williams v. Milwhite Sales Co., supra.

#### 4.

■ A worker may be a seaman although variously assigned to several different vessels from time to time. Braniff v. Jackson Ave. Ferry (5 Cir.) 280 F.2d 523.

#### 5.

■ The Jones Act covers land-based accidents of seamen if they occur in the course of employment. O'Donnell v. Great Lake Dredge & Dock Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596; Braen v. Pfeifer Oil Transportation Co., 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191; Magnolia Towing Co. v. Pace (5 Cir.) 378 F.2d 12; Crafton v. Tennessee Valley Sand & Gravel Co. (5 Cir.) 408 F.2d 1096; Williams v. Milwhite Sales Co. (E.D.La.) 197 F.Supp. 730; Smith v. Brown & Root Marine Operators (W.D. La.) 243 F.Supp. 130; Vincent v. Harvey Well Service (5 Cir.) 441 F.2d 146, 1971.

#### 6.

■ Seamen who are injured on shore while engaged in temporary or fill-in work for their employer are covered by the Jones Act. Magnolia Towing Co. v. Pace, supra; Crafton v. Tennessee Valley Sand & Gravel, supra; Williams v. Milwhite Sales Co., supra; Smith v. Brown & Root Marine Operators, supra; Vincent v. Harvey Well Service, supra.

#### 7.

■ Darrell Taylor was a seaman injured while in the course of his duties on a temporary land-based job in the course of his employment with Packer Diving and Salvage Co. due to the negligence of Packer Diving and Salvage Co., its officers and employees.

#### 8.

■ The question of medical causation is one of fact for the trier of fact under the Jones Act. Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142, 1960 AMC 10 (1959).

#### 9.

■ A seaman does not assume the risk of a lawful order even if it involves risk of injury. Cox v. Esso Shipping Co. (5 Cir.), 247 F.2d 629. Nor can the defense of "assumption of risk . . . be applied under the label of contributory negligence" in such a situation. San

**372**

Pedo Companio Armedoras, S. A. v. Yannacopoulas (5 Cir.), 357 F.2d 737, 741; Neal v. Saga Shipping Co., S. A. (5 Cir.), 407 F.2d 481, cert. den. 395 U. S. 986, 89 S.Ct. 2143, 23 L.Ed.2d 775; Pedersen v. Diesel Tankers (S.D.N.Y.), 280 F.Supp. 421; Miranda v. Texaco, Inc. (D.C.Pa.), 299 F.Supp. 658; Callendar v. Employers Liability Assurance Corp. (E.D.La.), 283 F.Supp. 213.

### 10.

◼ A seaman may recover from his employer for negligence, however slight, which causes him injury. Jones Act, 46 U.S.C. § 688.

### 11.

◼ The question of contributory negligence is a question of fact for the trier of fact. The trier of fact may in determining this fact, consider the realities of the situation, the economic dependence of the worker on continued employment, and the law's general approach that in fostering industry safety the burden of non-compliance with standards of care is ordinarily placed directly on the employer. Manning v. M/V Seardad (5 Cir.), 417 F.2d 603.