Deborah M. BERTRAND, et al.

v.

INTERNATIONAL MOORING &
MARINE, INC.

Lisa A. BERTRAND, et al.

v.

INTERNATIONAL MOORING &
MARINE, INC.

Marilyn Emery SMITH, et al.

v.

INTERNATIONAL MOORING &
MARINE, INC.

Shmuel MEZAN

v.

INTERNATIONAL MOORING &
MARINE, INC.

Civ. A. Nos. 800569, 800570, 810051
and 810079.

United States District Court,
W. D. Louisiana,
Lafayette-Opelousas Division.

June 19, 1981.

Hunt, Godwin, Painter & Roddy, Lake Charles, La., for plaintiffs in 800569 and 800570.

David Painter, Lake Charles, La., for plaintiffs in 800569.

John S. Hood, Lake Charles, La., for plaintiffs in 800570.

Allen, Gooch & Bourgeois, Raymond Morgan Allen, Lafayette, La., for International Mooring & Marine, Inc. & Fidelity & Cas. Co.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert M. Contois, New Orleans, La., for Arkwright Boston Mfg. Mut. Ins. Co.

Voorhies & Labbe, W. Gerald Gaudet, Lafayette, La., for American Gen. Ins. Co.

Beard, Blue, Schmitt, Mathes, Koch & Williams, W. G. Tabb, III, New Orleans, La., for plaintiffs in 810051.

Conery & Breaux, Terry G. Breaux, Franklin, La., for plaintiff in 810079.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

SHAW, District Judge.

### Statement of the Case

These consolidated cases arose out of a one-vehicle collision involving a Ford van operated by Robert Clark on April 14, 1979, on Louisiana Highway 82, in Cameron Parish, Louisiana, resulting in injuries to passenger, Shmuel Mezan, and the deaths of three other passengers, Emile Bertrand, III, Paul Bertrand and William Emery. Three additional crew members were passengers in the vehicle. However, no claims have been presented to this Court by them or on their behalf. All of the occupants of the vehicle were employees of International Mooring and Marine, Inc. (IMM) and except for Paul Bertrand, were members of an anchoring and mooring crew which had just completed a one-week job (April 7, 1979, to April 14, 1979) on the Aquamarine 503 (503), a special-purpose vessel that Tenneco Oil Company (Tenneco) had provided in order for IMM to relocate the drilling barge, Marlin 7, from off the coast of Louisiana, to a point near Galveston, Texas. Paul Bertrand, a rigger, on call at the IMM office in New Iberia, was dispatched to Galveston, to bring the crew back to New Iberia, Louisiana, in the company van at the completion of the job. On the return trip from Galveston, Robert Clark, the company officer in charge, replaced Paul Bertrand as driver.

All plaintiffs moved for summary judgment on the grounds that Shmuel Mezan, Emile Bertrand, III, Paul Bertrand and William Emery were seamen and members of the crew of the 503, and other vessels in a fleet owned, chartered, and/or managed or controlled by defendant, IMM. Defendants, American General Insurance Company and Arkwright Boston Manufacturers Mutual Insurance Company, have moved for summary judgment on the ground that Mezan, the two Bertrands and Emery, as a matter of law, were neither seamen nor members of the crew of the 503, nor any identifiable fleet or group of vessels. For the purpose of this motion, defendants are not raising any substantial difference be-

tween the status of those who worked on the 503 and Paul Bertrand, who was not a member of the anchor-handling crew on this job, but was sent by IMM to Galveston, to transport the crew to New Iberia.

### Undisputed Facts

#### I.

On April 14, 1979, the plaintiff, Shmuel Mezan, and decedents, Emile Bertrand, III, and William Emery, as well as the supervisor/driver, Robert J. Clark, were employed as anchor handlers for defendant, IMM.

#### II.

IMM did not own any of the vessels on which these anchor-handling crew members performed their work.*

#### III.

The injuries and deaths arise from a one-car collision on Louisiana Highway 82 in Cameron Parish, Louisiana, which occurred while these employees, in the course of their employment, were being transported by their employer, IMM, from Galveston, Texas, to IMM's office in New Iberia, Louisiana, after completing a job offshore.

#### IV.

IMM is an oilfield service corporation with its home office in New Iberia, Louisiana, specializing in the anchoring and mooring of offshore drilling barges and tender vessels.

#### V.

Specially outfitted vessels are required to perform IMM's functions. This work cannot be completed without vessels equipped for lifting heavy anchors from the ocean bed onto their decks.

#### VI.

These crew members lived and worked aboard this vessel and similar vessels for the duration of their work assignments, which generally ranged from several hours to seven days and the average job lasted four to five days.

#### VII.

Crew members assisted in getting the vessels into ready condition for the particular assignment and performed all of their functions on or from the vessels provided to them.

#### VIII.

Prior to this particular job aboard the 503, these crew members had worked on a number of similar vessels provided to IMM by their customers for IMM to use in conducting its anchoring and mooring operations.

#### IX.

On these type jobs, the vessels were generally chartered by the customer but at times, IMM acted as a broker for the customer and did, on occasion, charter vessels directly for their own use and then bill the customer for the cost.

#### X.

IMM's crew included an operator for the mooring winch on the vessels. The vessels generally provided their own master, cook, deckhands and mechanic—an ordinary ship's complement.

#### XI.

The anchor-handling crew members performed approximately ninety per cent of their work aboard vessels. The other ten per cent of their work was performed ashore in preparing equipment for their offshore vessel assignments.

---

* Plaintiffs claim that IMM did own vessels in that IMM created a division, INMAR, to provide supply boats for offshore drilling and production. INMAR is a separate entity from IMM but even if it weren't, the fact remains that Mezan only worked on one of the five INMAR boats on two occasions and Bertrand on only one occasion.

## XII.

The work records do not substantiate patterns of regular and continuous jobs on any one vessel or specific fleet of vessels, although these crews were regularly and continuously assigned to vessel-related activity and further, their expertise in anchor handling and mooring rendered them integral and indispensable to their employer's offshore operations.

## XIII.

The 503 was not owned by IMM and had been provided by Tenneco for use by the anchoring and mooring crew. The job which had been conducted on and from the 503 had been an ordinary mooring job, wherein the crew members had loaded themselves, their equipment and their personal belongings onto the vessel to remain for the duration of this particular job assignment.

## XIV.

Immediately prior to the accident, this crew had completed a seven-day relocation job for Tenneco. Tenneco had chartered the 503 for IMM's crew to use in relocating the Marlin 7 from Intracoastal City, Louisiana, to off the coast of Galveston, Texas. The 503 came with an ordinary crew and was supplemented by the seven-member IMM anchoring and mooring crew: Robert J. Clark, supervisor; Emile Bertrand, III, operator; Shmuel Mezan, rigger; and William Emery, rigger and three other members.

## XV.

Paul A. Bertrand was ordinarily a rigger on this crew; however, on this particular occasion, he had remained at the New Iberia office of IMM on standby. One of the duties of standby riggers is to drive personnel to and from job sites. Therefore, when the crew arrived at Galveston, Texas, via helicopter from the 503, Paul Bertrand was dispatched from New Iberia, to transport the crew back to the New Iberia office.

## XVI.

The work summaries compiled from individual time sheets and work records and submitted by counsel as attachments to their Motions for Summary Judgment are apparently incomplete as to William Emery and Paul Bertrand. However, extensive chronological reviews have been offered on behalf of Emile Bertrand, III and Shmuel Mezan. Therefore, since the excerpts submitted on behalf of Paul Bertrand and William Emery indicate that their work patterns would be very similar to that of the other crew members and since it is clear that their work is also maritime in nature, this Court will assume that more complete documentation on these two individuals would reveal that they, too, performed above ninety per cent of their work on vessels as did Mezan and Emile Bertrand, and furthermore, that the average duration of each vessel-related job which they performed would be substantially equivalent to those of the other crew members.[1]

## XVII.

Time sheet summaries indicate that during an eight-month period, Shmuel Mezan was employed by IMM from September 15, 1978, through April 14, 1979, and he accrued some 2,287 hours. Of those hours, 2,109 were performed on vessels and 178 hours were performed on land preparing equipment in IMM's yard to be used at sea. Mezan's record further indicates that his vessel-related work assignments lasted from as little as a few hours to as much as one twelve-day hitch, with an average duration of three to four days. During that time, Mezan was assigned to four different vessels as many as three times; on eight vessels twice, and once on the ten other vessels to which he was assigned during this eight-month period.

## XVIII.

The work summary of Emile Bertrand, III, spanning a one-year time period, from

---

1. See Work Summaries—Appendix I

April 7, 1978, through the date of this accident, April 4, 1979, reveals a very similar work history. Although an hourly breakdown is not provided for Mr. Bertrand, it appears that *all* of his work was vessel-related. Perhaps this is because he was the "operator" of the mooring winch aboard the vessels, and apparently, he did not volunteer for the extra hours available ashore, as did Mr. Mezan and the others.

Emile Bertrand's work summary reveals that his vessel assignments ranged from as little as one day to as much as one nineteen-day hitch, with an average duration of some five and one-half days. During this one-year period, Bertrand was assigned to twenty-five different vessels and had been assigned to four vessels twice; all others once. His summary indicates that he had had twelve vessel assignments which lasted five days or longer.

### Conclusions of Law

#### I.

■ An employer, although not a shipowner, can still become liable to his employees under the admiralty law including the Jones Act, *Mahramus v. American Export Isbrandtsen Lines, Inc.*, 475 F.2d 165 (2nd Cir. 1973), and the site of the injury does not affect recovery if one is, in fact, a seaman, *Higginbotham v. Mobil Oil Corporation*, 545 F.2d 422 (5th Cir. 1977). However, the fact that one is doing seaman's work aboard a vessel when injured, is, by itself, not enough to vest one with seaman's status. *Longmire v. Sea Drilling Corporation*, 610 F.2d 1342 (5th Cir. 1980).

#### II.

A Court may in the proper case, hold that there is no reasonable evidentiary basis to support a jury finding that an injured person is a seaman under the Jones Act. Whether or not there is a reasonable evidentiary basis for submitting the issue of seaman status to the jury, the factors to be considered are set forth in *Offshore Company v. Robison*, 266 F.2d 769 (5th Cir. 1959) and reiterated in *Longmire*, at Page 1346:

"(1) [whether] there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) *or* performed a substantial part of his work on the vessel; *and* (2) [whether] the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

"Robison, 226 F.2d at 779 (emphasis added). * * * "

#### III.

■ Nor does the fact that the injury occurs prior to the actual arrival aboard a vessel mean that one has not yet become a seaman. *Porche v. Gulf Mississippi Marine Corporation*, 390 F.Supp. 624 (E.D.La.1975).

#### IV.

■ When transportation to and from work aboard a vessel is supplied by the employer in the employer's interests, the employee is engaged in the course of his employment during the period of transportation. *Vincent v. Harvey Well Service*, 441 F.2d 146 (5th Cir. 1971).

#### V.

■ The word "permanent" has never been given a literal interpretation under the Jones Act, *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 327 (5th Cir. 1977), and a worker need not be connected with one vessel in order to meet the requirements necessary for Jones Act status since a seaman may be a member of a crew of numerous vessels, *Braniff v. Jackson Ave.-Gretna Ferry, Inc.*, 280 F.2d 523 (5th Cir. 1960), and a person will not be deprived of his Jones Act rights merely because he serves aboard a vessel for only a relatively short period of time. *Porche*, supra, at Page 631.

## VI.

"Nevertheless, the broad parameters of definition must be established if the terms are to have content." *Powers v. Bethlehem Steel Corporation*, 477 F.2d 643 (1st Cir. 1973). If what emerges from facts and inferences taken most favorably to the plaintiff cannot establish a "more or less permanent connection with the vessel or with a specific group of vessels", a jury may not make it one. At times, the Court uses the words "fleet of vessels". At other times, it uses the words "group of vessels", and still other times, "specific vessels". Regardless of which phrase the Court uses, to be a member of a crew of numerous vessels would require that the group or fleet act together under one control or gather closely together and form a recognizable unit. Therefore, it would appear that one cannot be a member of a crew of numerous vessels which have no common ownership or control.

## VII.

The leading cases that are generally cited to support seaman's status in situations such as this, are *Ardoin v. J. Ray McDermott & Company*, 641 F.2d 277 (5th Cir. 1981); *Davis v. Hill*, supra; *Landry v. Amoco Production Company*, 595 F.2d 1070 (5th Cir. 1979); *Porche v. Gulf Mississippi*, supra; *Braniff v. Jackson Ave.-Gretna Ferry, Inc.*, supra; *Taylor v. Packer Diving and Salvage Company*, 342 F.Supp. 365 (E.D.La. 1971), aff'd., 457 F.2d 512. In all of these cases, there was evidence from which a reasonable person could conclude that there was a relationship between the claimant and a specific vessel or identifiable group of vessels.

In *Ardoin*, there was evidence that the plaintiff, a structural welder, could have been permanently assigned to a fleet of a half dozen derrick barges owned by his employer, McDermott. The nature of Ardoin's employment was such that he never worked except in conjunction with one of these barges. In *Davis*, there was evidence that a welder's helper could have had a permanent connection with the derrick barge, W–701, chartered by his employer. In *Landry*, the plaintiff worked on her employer's barges and was injured when she jumped from one to another. In *Porche*, the decedent was replacing a man who was a member of the crew of the RB–2, and lost his life on a crew boat prior to its arrival at the vessel. In *Braniff v. Jackson Ave.-Gretna*, it was a regular part of decedent's duties to board each of his employer's several ferries every morning to determine if any repairs or maintenance work was needed. The Court reversed a summary judgment entered by the trial judge for defendant and stated that it would not offend the permanency requirement of Robison if the decedent was assigned to several *"specific"* vessels or performed a substantial part of his work on the several *"specified"* vessels.

In *Taylor*, the plaintiff was assigned by his employer to a pipe-burying barge owned by Aquatic Marine for three months and then for approximately two months to the barge, Paker I, which his employer had leased for its own work, and then to a jack-up barge leased by his employer from Arthur Levy for underwater welding work on which the plaintiff spent an entire working month. The Court found that the plaintiff, injured while temporarily assigned to a land job, was a seaman. However, in *Taylor*, there was a group of specified vessels on which the plaintiff performed substantially all of his work.

In *Culver v. Slater Boat Company*, 644 F.2d 460 (5th Cir. 1981), the opinion indicates that the widow and children of a seaman of an anchor-pulling crew sued and recovered under the Jones Act. However, the issue of the decedent's status was evidently conceded and no determination was made by the jury in the trial court.[2]

In *Magnolia Towing Company v. Pace*, 378 F.2d 12 (5th Cir. 1967), the plaintiff who worked as a pilot for the defendant tugboat owner was at home off duty in Baton Rouge, when he was called to Vicksburg, where he was to board a tugboat as a pilot.

---

**2.** See copy of interrogatories attached—Appendix II

Enroute to Vicksburg, he was injured in an automobile accident. The Court found that he was a seaman, noting that he was permanently assigned to one or another of the defendant's tugboats and any uncertainty as to which one was not material.

## VIII.

In *Rotolo v. Halliburton Company*, 317 F.2d 9, 13 (5th Cir. 1963), decedent was found not to be a seaman when, at no time, was he permanently assigned to or connected with a specified boat, or two or more specified boats and did not do a substantial part of his work on a specified boat or two or more specified boats.

Often cited (but not controlling), to defeat the permanency requirement of Robison is the New York State case of *Lotzman v. Oxyness Shipping Co., Inc.*, 93 Misc.2d 461, 402 N.Y.S.2d 964, 1978 Am.Mar.Cas. 1248 (1978), where the Court found that a compass adjuster who performed all of his work aboard vessels was not a Jones Act seaman due to the lack of any permanent connection with a vessel.

In the recent decision of *Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir. 1981), the Court held that line handlers, injured while engaged in the classical seaman's work of handling the lines of a vessel on a regular basis do not qualify as "true seamen" since they are not more or less permanently assigned to a particular vessel or specific fleet of vessels, but instead, perform duties aboard any vessel that happens to be navigating the Panama Canal.

In *Guidry v. Continental Oil Company, et al.*, 640 F.2d 523 (5th Cir. 1981) the Court made it clear that the relationship between the individual and an identifiable vessel or group of vessels must be substantial in point and time, not spasmodic.

" * * * *The key is that there must be a relationship between the claimant and a specific vessel or identifiable group of vessels.*

"Guidry's deposition was quite explicit his assignment to any particular structure was random. At no time was he assigned to work on a particular rig on a continuing or regular basis. *See, e. g., Stokes v. B. T. Oilfield Services, Inc.*, 617 F.2d 1205, 1207 (5th Cir. 1980); *Keener v. Transworld Drilling Co.*, 468 F.2d 729, 732 (5th Cir. 1972). Indeed, of the forty different rigs Guidry was assigned to during his career, thirteen were non-vessel fixed platforms, seven were on land, and of the remaining twenty movable rigs he was on thirteen only once and never did he return to a specific rig more than three times." (Emphasis added)

Although this anchor-handling crew was continuously subjected to the perils of the sea like blue water seamen and was engaged in classical seaman's work, the Court finds as a matter of law that there is no reasonable evidentiary basis to support a jury finding that the injured party and the decedents involved herein were permanently assigned to any specific vessel or group of vessels and therefore, they were not seamen under the Jones Act. The Motions for Summary Judgment by the defendants are GRANTED.

# APPENDIX I

## WORK SUMMARIES

| | SHMUEL MEZAN | | EMILE BERTRAND, III | |
| | Period Covered: 9/15/78–4/14/79 | | Period Covered: 4/7/78–4/4/79 | |
| Vessel | Number of Assignments To Vessel | Total Duration In Days | Number of Assignments To Vessel | Total Duration In Days |
|---|---|---|---|---|
| 1. Inmar Prince | 2 | 4 | | |
| 2. Inmar Count | | | 1 | 3 |
| 3. Cozumel Island | 2 | 2½ | | |
| 4. Breton Island | 1 | 1 | | |
| 5. Padre Island | | | 1 | 6 |
| 6. Banda Seahorse | 2 | 2 | 1 | 5 |
| 7. Atlantic Seahorse | 1 | 12 | 2 | 6 |
| 8. Star Light | 1 | 1½ | | |
| 9. Morning Light | 2 | 3½ | 1 | 6 |
| 10. Northern Light | 3 | 5 | 2 | 10 |
| 11. Cpt. Francois LeClerc | 3 | 9 | | |
| 12. Calico Jack | 3 | 6½ | 1 | 5 |
| 13. M/V L'Olonnois | 2 | 4½ | 1 | 1 |
| 14. Gulf Fleet 14 | | | 1 | 4 |
| 15. Gulf Fleet 15 | | | 1 | 3 |
| 16. Gulf Fleet 23 | 2 | 6 | | |
| 17. Gulf Fleet 26 | 2 | 9 | | |
| 18. Aquamarine 301 | 1 | 3 | 1 | 3 |
| 19. Aquamarine 501 | | | 1 | 4 |
| 20. Aquamarine 503 | 1 | 8 | 1 | 8 |
| 21. Aquamarine 504 | 1 | 4 | 2 | 6 |
| 22. M/V Independence | 1 | 4 | 1 | 3 |
| 23. Freedom Service | | | 1 | 9 |
| 24. Liberty Service | | | 1 | 4 |
| 25. Ocean King | | | 1 | 4 |
| 26. Ocean Marlin | | | 1 | 5 |
| 27. Ocean Tarpon | | | 1 | 11 |
| 28. M/V Salem | 1 | 2 | 1 | 2½ |
| 29. State Brigade | 2 | 6 | | |
| 30. State Command | | | 1 | 4 |
| 31. M/V Bering Seal | 3 | 7½ | | |
| 32. Rhonda Martin | 1 | 4 | 1 | 2½ |
| 33. Ann Bonney | 1 | 2 | 2 | 8 |
| 34. Resolute | | | 1 | 19 |

# APPENDIX II

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RUTH CULVER, ETC., ET AL | CIVIL ACTION |
| VS. | No. 76–1377 |
| SLATER BOAT COMPANY, ET AL | SECTION "A" |

### JURY INTERROGATORY FORM

1. Was defendant Gulf Overseas Marine Corporation or Gulf Overseas Service Corporation negligent in a manner that was a cause of the injury and death of Mr. Curtis Culver?

Yes ___✓___ No _____

Go to Question # 2.

2. Was defendant EuroPirates International, Inc. negligent in a manner that was a proximate cause of the injury and death of Mr. Curtis Culver?

Yes ___✓___ No _____

Go to Question # 3.

3. Was defendant Ocean Drilling and Exploration Company or ODECO, Inc. negligent in a manner that was a proximate cause of the injury and death of Mr. Curtis Culver?

Yes ___✓___ No _____

Go to Question # 4.

4. Was the vessel BLACK BART unseaworthy in a manner that was a proximate cause of the injury and death of Mr. Curtis Culver?

Yes ___✓___ No _____

**350**

If your answer to either # 1 or # 2 or # 3 or # 4 or any combination of them was "Yes," go to Question # 5.

If your answers to # 1 and # 2 and # 3 and # 4 were all "No," stop, skip the remaining questions on this form and return to the Courtroom with your verdict.

5. Was Mr. Curtis Culver negligent in a manner which contributed to causing his own injury and death?

Yes _____ No ✓

If your answer to # 5 was "Yes," go to Question # 6. If your answer to # 5 was "No," go to Question # 7 and skip # 6.

6. If your answer to # 5 was "Yes," then to what extent did Mr. Culver's own negligence contribute to his injury? (Any answer to this question should be expressed in the form of a percentage.)

_____%

Go to Question # 7.

7. Fill in the amounts beside the statements below which will fairly and adequately compensate Mrs. Culver and her children for their damages. In the event that, as to any one or more of the following items, you should find that plaintiff is not entitled to damages, you should not fill in such blank, but skip it, and go on to the next one.

a. The amount, if any, due to Mrs. Culver and her children for loss of support from May 9, 1975, the date of the accident, until the present date?

$71,062.00

b. The amount, if any, Mrs. Culver and/or her children will lose in support from Mr. Culver each calendar year after the date of this trial as the result of his death?

$13,363.20 per year.

c. The number of years, if any, Mrs. Culver and/or her children will sustain the yearly loss of support that you have listed in part (b) of this question. Indicate the total number of years in the space.

31 years

d. The amount, if any, Mrs. Culver is due for loss of her husband's household services?

$1,500

e. The amount, if any, the Culver children will lose as the result of the loss of their father's guidance, training, and nurture while they are minors; the children's names and ages at the time of Mr. Culver's death follow. Any answer to this question must indicate a figure as to each child.

Benny (13) $ 5,000
Tonia (9) $ 5,000
Rodney Wayne (7) $ 6,000
Bridgett (2½ Mos.) $ 8,000

f. If you have made any award to plaintiffs for loss of support and/or services in the future (parts

b, c, and d of this question), what discount percentage rate do you find to be applicable in order to reduce the award for future loss of support and/or services to their present value. (Your answer to this question should be in the form of a percentage.)

_____% Twenty-five percent

New Orleans, Louisiana, this 28th day of September, 1979.

/s/ Julius Lee
FOREPERSON