**Jimmy YELVERTON, Plaintiff,**

v.

**MOBILE LABORATORIES, INC., Defendant.**

**Civ. A. No. H79–0127(R).**

United States District Court, S.D. Mississippi, Hattiesburg Division.

May 2, 1985.

Charles W. Dittmer, Jr., New Orleans, La., J. Larry Walters, Laurel, Miss., for plaintiff.

Louis Ruffin, Thomas W. Tyner, Dorrance Aultman, Hattiesburg, Miss., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**WALTER L. NIXON, Jr., Chief Judge.**

The bench trial of this Jones Act and general maritime action was commenced and finished on February 11, 1985. We now make our findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P.

### Background

This action arises from a two-vehicle accident which occurred near Diamond, Louisiana, on Louisiana Highway 23, a two-lane paved highway. It is stipulated that the plaintiff was employed by the defendant and was in the course and scope of his employment when the accident occurred. The accident resulted in the tragic death of the plaintiff's passenger and co-worker, Charles Lambert, and relatively minor injuries to the plaintiff in comparison. The plaintiff's chief complaints at trial were an injured right knee, an injured left wrist, and certain chest, neck and back pains, all of which he alleges he suffered as a result of the accident. Yelverton contends that he was a seaman, both under the Jones Act, 46 U.S.C. § 688, *et seq.*, and the general maritime law. As a seaman, Yelverton seeks to take advantage of the "featherweight" burden of proving negligence under the Jones Act and his absolute entitlement to "maintance and cure" under the general maritime law. From the outset, Mobile Laboratories, Inc. (Mobile) has denied Yelverton's status as a seaman, which would necessarily deny Yelverton the benefits of the Jones Act or his right to maintenance and cure. Alternatively, the defendants contend they were guilty of no wrongful act or omission which contributed to the accident.

### Yelverton's Employment Status: Seaman or not?

Since this Court's jurisdiction and Yelverton's entitlement to relief turns, in the first instance, on whether he may be characterized to be a seaman, under the facts and law, we detail our findings with respect to his status.

On August 16, 1977, Yelverton was returning to Venice, Louisiana, to catch a crew boat to take him to a spud-type pipelaying barge, owned and operated by Berry Brothers, Inc. (Berry). Berry was under contract with Shell Oil Company to lay a pipeline from an oil well to a production platform, and Berry had contracted with Mobile to perform the weld inspections. The plaintiff was employed by Mobile as a radiographer (X-ray technician) with the primary duty of conducting radiographic examinations of welds on pipelines being laid by companies that had contracts with Mobile.

This pipelaying activity was taking place in what is referred to as East Bay, which is located in the southeastern inland waters off the coast of Louisiana. Yelverton had worked on this particular assignment for three to six weeks preceding the accident. Joe Clements, General Operating Manager of Berry, testified that the jobs performed by Berry often lasted a month or longer and that the crew, including Mobile's employees, remained on the barge until completion of the project, although they occasionally had a two- or three-day shore leave to allow repositioning of the barge. This particular lay barge was not equipped with sleeping quarters but the crew members of the barge, including Yelverton, slept on an offshore platform in quarters provided by Shell Oil.

In the year preceding the accident, the plaintiff spent approximately 95 percent of his time working offshore on pipe-laying barges. Some of these barges were equipped with living quarters and Yelverton often remained out to sea for 60 days. But most importantly, the plaintiff's rela-

tion to the barge to which he was assigned at the time of the accident was not transitory—neither in the work he did nor the time of its duration. Yelverton's work on the offshore barge was not incidental to some shore-based employment but, rather, as testified to by Richard Walker, it was what Yelverton was employed to do.

We find from the evidence that the plaintiff was both permanently attached to the vessel and, further, that he performed a substantial part of his work on vessels of a very similar nature.

The mission of the lay barge is quite simple—to lay pipeline. On the basis of the record, Yelverton's job onboard the barge contributed to its mission. All witnesses concurred that the pipeline would not have been laid without the welds being inspected by the plaintiff or one in his position. In this sense, the plaintiff was essential to the function of the vessel.

### The Accident

As set out *infra*, to justify a damage recovery from this defendant, the plaintiff must show that, in addition to being a seaman, his employer committed some negligent act or omission that was a legal producing cause, however slight, of the collision. To shoulder the defendant with such liability, the plaintiff attempted to prove the defendant's awareness of a brake problem on the vehicle which Yelverton was driving. This defect, it is contended, prevented Yelverton from avoiding the accident or mitigating its consequences. He argues that the defendant's failure to provide him with a company truck for transportation, after request, and allowing or demanding that he proceed in a vehicle with faulty brakes constituted negligence.[1]

Of course, to be meritorious, this argument presumes the defendant's knowledge of the problem. The testimony on this point is in conflict. Yelverton was adamant that he told Fred Hogue, the defendant's dispatcher, that his brakes were bad

and that he needed to use a company vehicle. Hogue testified, by deposition, that he did not recall Yelverton's telling him about the brakes being faulty but did remember some discussions about the car experiencing mechanical problems. He also remembers Yelverton's request for a company truck. It is undisputed that no company vehicle was available for use at the time.

It is noteworthy that the plaintiff did not mention any brake problems in a statement he gave the day after the accident (Exhibit D–4); rather, he stated therein that he had no need for a company truck. Nor did Yelverton mention faulty brakes to Deputy Sheriff Carnie Burcham, the investigating officer at the accident scene. We note these omissions not to imply that Yelverton did not have a brake problem, but only as support for the inference that they were not as faulty as claimed at trial. Had Yelverton's brakes been as bad as he claimed, it seems reasonable to expect that he would have mentioned such in statements made so contemporaneous to the accident.

It is more plausible, in our view, that Yelverton told Fred Hogue about general car problems only in an effort to explain his extreme tardiness in reporting for work that day. When Yelverton arrived in Harvey, Louisiana, the site of the defendant's offices, he was already some five hours late, a fact that obviously irritated Fred Hogue and Richard Walker and one that delayed the barge crew from departing from Venice. Thus, we do not accept Yelverton's testimony that he expressly told Fred Hogue about his brakes. His concerns at the time were to explain his lateness and "to get on down to Venice." While Yelverton may have requested a truck, he did not preface it by apprising the defendant of an *unsafe* condition on his car. Allowing him to use his own vehicle was a traditional company policy. Without notice of the defect and an order to proceed

---

1. Yelverton was using his own vehicle pursuant to Mobile's policy allowing employees to be reimbursed for mileage and travel time rather than provide a fleet of company vehicles. It is not suggested that this policy is *per se* unreasonable.

notwithstanding it, such a policy is not unreasonable under all the circumstances.

Even assuming that Yelverton did tell Fred Hogue about his alleged brake problems, we further find that the sole proximate cause of this accident was the act of a third party for whom the defendant is not responsible—Donna Boone, the driver of the car that collided with Yelverton's. Based on the testimony, particularly that of Burcham and Willferd Doss, we find that the collision was unavoidable from Yelverton's standpoint. Miss Boone was driving north on Louisiana Highway 23; she had just successfully negotiated passing an over-width tractor/trailer truck when she apparently lost control of her automobile, swerving into the southbound lane, which was being traveled by Yelverton. Miss Boone and Yelverton were estimated as traveling in excess of 60 miles per hour and 40 to 55 miles per hour, respectively. From all the testimony, Miss Boone's vehicle had returned to the northbound lane after passing the tractor/trailer truck when it suddenly began to swerve. The physical evidence and eye-witness testimony indicates that the accident was very nearly a headon collision in the southbound lane. Given the combined speed the two vehicles were traveling, Yelverton was most probably afforded precious little time to respond to the situation. Paraphrasing Willferd Doss, even had Yelverton stopped, a headon collision would have still occurred. Under our view and interpretation of the facts, the brakes had no causal effect one way or the other with the collision and its attendant injuries. Unfortunately, Yelverton had no time for any effective evasive or preventive actions.[2]

### Facts Relative to the Maintenance and Cure Claim

Assuming Yelverton to be a seaman and notwithstanding a finding of no fault or causation which can be attributed to the defendant, certain other facts must be found. We will make them serially: (1) The plaintiff admitted that the defendant has paid all medical bills except for three for which he produced no documentation. (2) The plaintiff reached maximum medical recovery on July 11, 1978, after being given a reasonable amount of time to lose enough weight to safely allow reconstructive knee surgery. (3) At some point in the future, after Yelverton loses an appropriate amount of weight, he will be in need of knee surgery, which can reasonably be expected to cost approximately $3,500.00. (4) Surgery on the left wrist would not appreciably improve the medical conditions. (5) The accident did not result in the plaintiff's back condition or any aggravation of a pre-existing condition. (6) After leaving the hospital, Yelverton returned to Ellisville, Mississippi, to live at home with his wife. No documentation was produced at trial to substantiate any lodging or food expenses. No probative evidence was offered to show the value, if any, of food provided to the plaintiff while working offshore.

### Conclusions of Law

As alluded to earlier in this opinion, in order to be entitled to recover, the plaintiff has the burden of proof on the issue of his status as a seaman. Ordinarily, this issue is a question of fact to be resolved by the jury, *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380 (5th Cir.1985); however, it has also been characterized as a mixed question of law and fact, *Holland v. Allied Structural Steel Corp., Inc.*, 539 F.2d 476, 479 (5th Cir.1976). We think the more correct view is that the issue is "one whose resolution requires 'the application of legal principles to specific underlying

---

**2.** The distance an object traverses when traveling at a rate of 60 miles per hour is approximately 86 feet per second. When coupled with the speed of an oncoming object, the time it takes the two objects to reach a common point progressively decreases. No doubt the eye witnesses to this accident were affected in their recollected observations by the sheer physics of the situation. Yelverton may well have experienced that "flash" that seemed like an "eternity." We are fortunately able to view the accident and its physical aspects from a much more enviable position.

facts about what the parties did or did not do.'" *Ardoin v. J. Ray McDermott & Co.*, 641 F.2d 277, 280 (5th Cir.1981) (quoting *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342 (5th Cir.1980)). The legal principles to be applied have been set out in countless cases but most decisions have used as their starting point for analysis the Fifth Circuit's decision in *Offshore Company v. Robison*, 266 F.2d 769, 779 (5th Cir.1959). Under *Robison:*

> [T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (*including special purpose structures not usually employed as a means of transport by water but designed to float on water*) or performed a substantial part of his work on the vessel; *and* (2) if the capacity in which he was employed contributed to the function of the vessel or to the accomplishment of its mission or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

*Id.* at 779 (footnote omitted) (emphasis added).

Although *Robison* deals with whether the status issue should go to the jury, it has been made clear that it is also to be used in delimiting the power of the factfinder to deny or confer such status. *Bertrand v. International Mooring & Marine, Inc.*, 700 F.2d 240, 244 (5th Cir.1983) (quoting *McDermott*, 679 F.2d at 457). The conjunctive test of *Robison* remains in force with minor modifications in this circuit. Its application is as varied as the facts presented under it, but the central requirement is that the claimant have more than a transitory connection with a vessel in order to recover under the Jones Act. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 326 (5th Cir.1977).

■ We first note that it has never been a requirement that the Jones Act employer be the owner or operator of the vessel of which the claimant is alleged to be a crew member. *See, e.g., Tullos*, 750 F.2d at 384;

*Buras v. Commercial Testing and Engineering Co.*, 736 F.2d 307, 311 (5th Cir. 1984); *Wallace v. Oceaneering Intern.*, 727 F.2d 427, 433 (5th Cir.1984); *Parks v. Dowell*, 712 F.2d 154, 156 (5th Cir.1983); *Bertrand v. International Mooring & Marine, Inc.*, 700 F.2d 240, 245 (5th Cir.1983); *Roberts v. Williams-McWilliams Co.*, 648 F.2d 255, 262 (5th Cir.1981); *Welch v. J. Ray McDermott & Co.*, 336 F.Supp. 383, 384 (W.D.La.1972).

At least two judges of the Fifth Circuit have recently noted the dilution of the requirement to meet seaman's status, *see Barrett v. Chevron, USA, Inc.*, 752 F.2d at 136, 137 (5th Cir.1985) (Jolly, J., dissenting and Gee, J., specially concurring) (*reh'g en banc* granted April 9, 1985). The facts of this case do not require such an expansive application of the *Robison* test. In fact, *Welch v. J. Ray McDermott & Co.*, 336 F.Supp. 383 (W.D.La.1972), is directly on point. In *Welch*, the district judge had no difficulty in holding that a welding inspector who performed the same duties under the same work arrangements as the plaintiff herein was a seaman under the *Robison* test. *Id.* at 384. Likewise, we have little difficulty in concluding that Yelverton was indeed a seaman. However, given the defendant's strong position on the issue, we take the time to detail our conclusion more fully.

To begin with, the *Robison* test is not to be given mechanical applications and its conjunctive elements are more often seen as an analytical starting point rather than a self-executing formula. See, *e.g., Davis v. Hill Engineering*, 549 F.2d at 327.

■ We have previously found, and it is really undisputed, that the plaintiff's work on board the lay barge contributed to the function of the vessel and the accomplishment of its mission. There is no legal principle whatsoever that would dictate a contrary finding.

Turning next to the question of permanency, we note that it has been recognized that the word permanent has not been assigned a literal interpretation under the

Jones Act. *Roberts v. Williams-McWilliams Co., Inc.*, 648 F.2d at 261. The outer reaches of the word's meaning seem to be bounded by the courts' desire to deny such status to those workers who are injured while on board vessels for an isolated piece of work. See *Buras*, 736 F.2d at 310; *Bertrand*, 700 F.2d at 247. In this sense, the Court has generally taken a "totality of the circumstances" approach. Numerous factors have been outlined, the aggregation of which in a particular case dictate a particular result. Generally, the factors are used to weed out those claimants that have a transitory connection with a vessel or group of vessels. But the duration of the connection with the vessel is not the key; rather, the focus is on the permanency of the assignment with the vessel during that particular job and not the actual duration of the assignment. *Davis v. Hill Engineering, Inc., supra.* (Plaintiff spent 85 percent of his working time on shore, but was still found to be a seaman where he was injured while assigned to a vessel for 20 or more days.) Most of the cases in which the courts have found the permanency requirement lacking have involved land-based workers who were fortuitously connected with the vessel or who had a random and sporadic relationship with vessels. See comparison of cases in *Davis v. Hill Engineering, Inc., supra*, and *Buras v. Commercial Testing & Engineering Co., supra.* See also *Wallace v. Oceaneering Intern.*, 727 F.2d at 433; *Bouvier v. Krenz*, 702 F.2d 89 (5th Cir.1983) (comparing and contrasting cases).

The defendant's reliance on *Jones v. Mississippi River Grain Elevator Co.*, 703 F.2d 108 (5th Cir.1983), is misplaced. The plaintiff, Jones, was a bargeman employed by a grain elevator, whose duties were to ensure that proper procedures for unloading were carried out. These duties took approximately 15 minutes to complete, and were performed on six to seven barges a day. His assignments were random and he never ate, slept or performed any other duties on the vessel in connection with his employment. *Jones*, 703 F.2d at 109.

In contrast, Yelverton's assignment with the lay barge was coextensive with that of other crew members of the barge who are, undoubtedly, seamen. See *Porche v. Gulf Marine Corp.*, 390 F.Supp. 624 (E.D.La. 1975). Yelverton was expected to begin the job with the other crew members on the barge and remain to its completion, taking only those breaks that the other crew members took. Yelverton was also as subject to the perils of the sea as were other crew members. Yelverton's assignment was certainly not sporadic, spasmodic or transitory. We find it irrelevant that Yelverton and other crew members did not sleep on this particular barge. They still remained at sea at night and sleeping quarters were provided on a fixed platform. The fact that the Berry Brothers barge was not equipped with living quarters does not dictate a different result. This is not a case comparable to those where the Fifth Circuit has emphasized that land-based shore workers, who eat and sleep at home but due to the nature of their work fortuitously find themselves at sea, are not Jones Act seamen. We think it quite obvious that Jimmy Yelverton was a seaman and so conclude.

### Jones Act Liability

 As a seaman, Yelverton has the right to recover damages from his employer if the employer was guilty of some negligence and such negligence played any role, no matter how slight, in producing the injury. *E.g., Theriot v. J. Ray McDermott & Co., Inc.*, 742 F.2d 877 (5th Cir.1984). Of course, the plaintiff bears the burden of proof on this issue, but it has often been characterized as "featherweight." *Comeaux v. T.L. James & Co., Inc.*, 702 F.2d 1023, 1024 (5th Cir.1983); *Davis v. Hill Engineering*, 549 F.2d at 331. Since we have found as fact that the defendant, through its agents, was unaware of any brake problem with Yelverton's car, we fail to discern any basis upon which to draw a conclusion of actionable negligence on the defendant's part. Yelverton's entire theory of negligence is premised on the failure of the defendant to offer alternative trans-

portation in light of its knowledge of the brake problem. (See Pretrial Order, Exhibit A.)

We have alternatively found that the acts of Donna Boone were the sole legal causes of the collision; therefore, even assuming notice, such had no causal connexity with the accident. This finding would totally exonerate the defendant in any event. Since Yelverton had no opportunity to take any evasive or mitigating action, the acts of the defendant, negligent or otherwise, cannot be an efficient producing cause of the consequences of the accident.

### Maintenance and Cure Liability

■ Unlike Jones Act liability, a seaman's entitlement to maintenance and cure is not predicated on fault or negligence of the employer. *Aguilar v. Standard Oil Co. of New Jersey*, 318 U.S. 724, 730, 63 S.Ct. 930, 934, 87 L.Ed. 1107 (1943); *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938). "The 'maintenance' exacted is comparable to that to which the seaman is entitled while at sea, and 'cure' is care including nursing and medical attention during such period as the duty continues." *Calmar*, 303 U.S. at 528, 58 S.Ct. at 653. This duty extends until the point of "maximum cure," which has been characterized as being reached "when it appears probable that further treatment will result in no *betterment* of the seaman's condition." *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir.1979). *See also, Farrell v. United States*, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949). "It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple and can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays and invite litigation." *Id.* at 516, 69 S.Ct. at 709–710.[3]

■ The absoluteness of Yelverton's entitlement to maintenance and cure does not dispense with the requirement that there be an evidentiary basis upon which to determine a justifiable amount. In the instant case, Yelverton admitted that the defendant had paid for all medical bills except for three for which he produced no documentation. This Court cannot speculate as to their amounts and refuses to base an award for cure on purely conjectural amounts. However, we have previously found that Yelverton is in need of surgery on his right knee, albeit not until he loses weight. The reasonable cost of this surgery will be approximately $3,500. Since this surgery will be needed in the future and its cost can be definitely ascertained, see *Calmar*, 303 U.S. at 531, 58 S.Ct. at 654, we conclude Yelverton is entitled to that amount.

We conclude that Yelverton's wrist injury has reached maximum medical cure since surgery would only relieve pain and discomfort. See *Pelotto*, 604 F.2d at 400.

■ There is absolutely no basis for any award of maintenance in this case. A seaman is not entitled to maintenance unless he incurs costs. *Marine Drilling, Inc. v. Landry*, 302 F.2d 127 (5th Cir.1962); *Stankiewicz v. United Fruit Steamship Corp.*, 229 F.2d 580, 581 (2d Cir.1956); *Field v. Waterman S.S. Corp.*, 104 F.2d 849 (5th Cir.1939); *O'Neill v. United States*, 157 F.Supp. 193, 202 (E.D.Pa.1957). *See also, Harper v. Zapata Offshore Co.*, 741 F.2d 87, 91 (5th Cir.1984) (no evidence to justify award over the value of food seamen testified he received); *Johnson v. United States*, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948) (no maintenance awardable where minor lived at home with parents).

### Punitive Damages

■ Recent case law has made it clear that there may be a punitive damage claim

---

**3.** With the recent expansive concept of "seaman" and the underlying purposes of maintenance and cure which pre-date by at least a century the changes in maritime employment, we question the continued validity of the above quotation. Anomalies may inevitably result, and this case may well represent one.

in addition to a claim for attorney's fees where the defendant willfully and arbitrarily refuses to pay maintenance and cure. *Harper,* 741 F.2d at 88; *Holmes v. J. Ray McDermott & Co.,* 734 F.2d 1110, 1118 (5th Cir.1984). This Court concludes that this certainly is not a case containing willful, wanton and callous conduct on the part of the defendant herein to justify an award of punitive damages.

### Conclusion

Based on all the foregoing, the defendant is entitled to a judgment in its favor on the plaintiff's Jones Act claim and punitive claim. The plaintiff is entitled to a judgment, awarding him thirty-five hundred dollars ($3,500), under the maintenance and cure count of his complaint subject to any setoff stipulated to at trial by counsel. Counsel are to submit a judgment conforming herewith within the time allowed by the local rules.